FILED

2008 Mar-25  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM S. WILSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case. No.: 3:06-CV-2067-RDP** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **Commissioner of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff William S. Wilson brings this action pursuant to Section 205(g) of the Social Security Act ("the Act") seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his application for a period of disability, Disability Income Benefits ("DIB"), and Supplemental Security Income ("SSI") benefits under Title XVI. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).   For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and proper legal standards were applied.

### I.      Procedural History

Plaintiff filed his application for a period of disability, DIB, and SSI benefits on November 14, 2002.  (Tr. 36-38).  Plaintiff's application was denied and he requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 26-31).  Plaintiff's cause was heard by ALJ Peter C. Edison on April 21, 2004.  (Tr. 216-29).  In his July 16, 2004 decision, ALJ Edison determined that Plaintiff was not eligible for a period of disability, DIB, or SSI benefits because he failed to meet the

disability requirements of the Social Security Act and retained the residual functional capacity ("RFC") to perform sedentary work.  (Tr. 8-22).

The Appeals Council denied Plaintiff's request for review of ALJ Edison's decision on August 26, 2004.  (Tr. 4-6).  Plaintiff filed a civil action in this court.  *Wilson v. Barnhart*, Case No. 3:04-cv-02931-LSC.  After the Appeals Council performed a second review of the ALJ's decision and requested that the case be remanded for further consideration, the court issued an order remanding the case. (Tr. 245).  Upon review, the Appeals Council vacated the Commissioner's final decision and remanded the case to an ALJ for further proceedings.  (Tr. 246-47).  The ALJ was instructed "to determine the impact of claimant's mental impairment on the types of sedentary jobs he could perform." (Tr. 247).

ALJ Earl Cates held a hearing on July 24, 2006.  (Tr. 410-45).  He issued a decision adverse to Plaintiff on August 9, 2006.  (Tr. 230-43). The ALJ's decision became the final decision of the Commissioner on the sixty-first day after it was issued, and therefore a proper subject for this court's review.  (Tr. 231).

Plaintiff was born on December 7, 1963 and has completed the tenth grade.  (Tr. 219, 83-85). He worked as a dye tub operator from 1983 until 2002. (Tr. 56-57.)  Plaintiff alleges that he has been unable to engage in substantial gainful activity since January 1, 2003, when he became unable to work due to bilateral avascular necrosis of talar domes, ankle arthritis, chronic back problems, hand numbness, and chronic knee and hip pain. (Tr. 66, 283).

Plaintiff was treated for knee, leg, and back pain as well as GERD, prostatitis, and cardiac pain prior to his alleged disability onset date of January 2003. (Tr. 90-99, 102-19, 122-27, 161-67). In August 2001, MRI results showed bilateral avascular necrosis of the ankles and nerve conduction

studies showed mild sensory neuropathy. (Tr. 131-32). Plaintiff saw Dr. Burnside from June to November 2002 for leg and foot pain associated with some numbness. (Tr. 154-57). Dr. Burnside referred Plaintiff to Dr. Saag, who diagnosed Plaintiff with avascular necrosis of the talar domes and recommended that Plaintiff take Vioxx and be fitted with orthotics. (Tr. 141). Dr. Saag referred Plaintiff to Dr. Thomas, a podiatrist. (Tr. 137). Dr. Thomas confirmed the diagnosis of avascular necrosis with x-rays in June 2003. (Tr. 197). After examining Plaintiff again in August, he prescribed Bledsoe boots and referred Plaintiff to a neurologist. (Tr. 195). The neurologist, Dr. Ryan, found Plaintiff to have red feet and mildly reduced response to pinpricks over his third digit and mild palm on his right hand. (Tr. 191). A subsequent visit to Dr. Ryan in September 2003 resulted in a diagnosis of bilateral carpal tunnel syndrome "slightly worse on the right." (Tr. 186).

Plaintiff also saw Dr. Mumford beginning in December 2003. (Tr. 204). Dr. Mumford diagnosed that Plaintiff was suffering from "major depressive disorder, single episode, moderate" and had a Global Assessment of Functioning ("GAF") score of 55. (Tr. 204). Dr. Mumford prescribed Lexpro, which helped with Plaintiff's irritability but did not make him less irritable. (Tr. 203).

Throughout the relevant time period, Plaintiff saw Dr. Hatchett, an orthopedist. The medical records show that he performed surgery on Plaintiff's right arm to treat his carpal tunnel syndrome on November 9, 2005. (Tr. 381). Dr. Hatchett noted that Plaintiff's right hand responded well to the procedure. (Tr. 375). In June 2006, Dr. Hatchett found that Plaintiff's knees and spine showed signs of degenerative changes. (Tr. 372). On July 21, 2006, Dr. Hatchett completed a medical source opinion for Plaintiff, indicating that Plaintiff had the following limitations: (1) stand for half an hour but not more than three hours per work day; (2) walk for half an hour but not more than two to three

3

hours per day; (3) sit without limitation; (4) lift and carry ten pounds frequently; and (5) lift and carry twenty pounds occasionally.  (Tr. 370).

Plaintiff went to the emergency room at the Eliza Coffee Memorial Hospital ("ECMH") on March 14, 2006, complaining of severe depression and suicidal thoughts.  (Tr. 302-03).  His GAF was assessed at 45.  (Tr. 305).  He also had some homicidal ideations.  (Tr. 309).  From ECMH, Plaintiff was referred to the Riverbend Center for Mental Health, where he began receiving regular psychiatric treatment.  On March 23, 2006, Dr. Scott assessed Plaintiff's GAF at 50.  (Tr. 294).  Plaintiff was prescribed Zoloft.  (Tr. 294).  The dosage was subsequently increased.  (Tr. 364).  On May 11, 2006, Dr. Scott assessed Plaintiff's GAF at 50 and elected to discontinue Zoloft in favor of Lexapro.  (Tr. 363).  After telling his therapist that Lexapro upset his stomach, Plaintiff resumed taking Zoloft per Dr. Scott's orders.  (Tr. 360)

## II.    ALJ Decision[1]

Determination of disability under the Act requires a five-step analysis.  *See* 20 C.F.R. § 404.1 *et. seq.*  First, the Commissioner determines whether the claimant is working.  Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities.  Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations.  Fourth, the Commissioner determines whether the claimant's RFC can meet the physical and mental demands of past work.  The claimant's RFC consists of what the claimant can do despite his impairment.  Finally, the Commissioner determines whether the claimant's age, education, and past work

---

[1]The ALJ decision relevant to this case is the second opinion in this case, issued by ALJ Cates on August 9, 2006.

experience prevent the performance of any other work.  In making a final determination, the Commissioner will use the Medical-Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and the RFC are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will provide no further review of the claim.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that he can no longer perform his former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once a claimant shows that he can no longer perform his past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

The ALJ found that Plaintiff has not engaged in substantial gainful activity since his alleged January 1, 2003 onset of disability.  (Tr. 233).  The ALJ determined that Plaintiff has a severe combination of impairments of bilateral avascular necrosis of the talus, bilateral carpal tunnel syndrome status post right carpal tunnel release surgery, major depression, and a generalized anxiety disorder, although he found that his impairments, considered either alone or in combination, fail to meet or medically equal the criteria of an impairment listed at 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 235-37).  According to the ALJ, Plaintiff's subjective complaints concerning his impairments and their impact on his ability to work are not fully credible due to the degree of inconsistency with the medical evidence established in the record and Plaintiff's own statements.  (Tr. 240-41).  The ALJ determined that Plaintiff retains the RFC to perform light and sedentary work with additional

5

limitations. (Tr. 238-39). He found that Plaintiff could not perform his past relevant work. (Tr. 241).

The ALJ called a vocational expert ("VE") to testify who was present throughout the hearing and familiar with Plaintiff's background. (Tr. 438-44). The VE testified that an individual with Plaintiff's limitations could perform jobs which exist in significant numbers in the regional and national economies. (Tr. 439-40). Based on the VE's testimony, the ALJ found that a significant number of jobs exist in the national economy that Plaintiff is capable of performing and that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 241-42).

**III.    Plaintiff's Argument for Remand or Reversal**

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the expiration of the period for Plaintiff to file objections, reversed, or in the alternative, remanded for further consideration. (Doc. # 9, at 8). Plaintiff asserts that there are four reasons why this court should grant the relief sought: (1) the ALJ did not address the medical evidence in the case, specifically Plaintiff's GAF score of 50 and the testimony of the VE indicating that a person with a GAF score of 50 would be generally unable to work; (2) the ALJ's RFC finding is not based on substantial evidence; (3) the ALJ's credibility findings are not based on substantial evidence; and (4) the ALJ did not sustain his burden of showing that there are other jobs in the national economy that Plaintiff can perform.

**IV.    Standard of Review**

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

**V.   Discussion**

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for remand and/or reversal. For the reasons outlined below, the court finds that the ALJ relied on substantial evidence and applied the proper legal standards.

A.     **The ALJ Properly Considered Plaintiff's GAF Scores and the Vocational Expert's Testimony**

Plaintiff's first argument is that the ALJ ignored his GAF scores.  When Plaintiff was admitted to Eliza Coffee Memorial Hospital on March 14, 2006, he was assessed to have a GAF score of 45.  (Tr. 305).  Two subsequent examinations, on March 23 and May 11, showed his score to be 50.  (Tr. 294, 362).  The Vocational Expert ("VE") testified that a GAF score around 50 "would usually indicate difficulty performing jobs."  (Tr. 442).

Defendant argues that the ALJ properly considered and discounted Plaintiff's GAF scores.  Defendant points out that the VE stated that GAF scores can fluctuate and that someone who was assessed with Plaintiff's GAF scores would not necessarily be precluded from working.  (*Id.*)  The fluctuation of GAF scores is noted in the DSM-IV-TR: "[i]n order to account for day-to-day variability in functioning, the GAF for 'the current period' is sometimes operationalized as the lowest level of functioning for the past week."  THE AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 34 (text revision of 4th ed., 2000) ("DSM-IV-TR").  In order for Plaintiff to establish disability based on his mental health status, he would have to show that the condition lasted twelve continuous months.  42 U.S.C. § 423(d)(1)(A); *Powell o/b/o Powell v. Heckler*, 773 F.2d 1573, 1576 (11th Cir. 1985).  Three months of GAF scores, even if they indicate limited functioning during that time, are insufficient to carry Plaintiff's burden of showing that his depression lasted twelve continuous months.  *See Walker v. Apfel*, 2007 WL 724167 at *7 (S.D. Ala. May 16, 2000) (finding that an isolated GAF score does not establish that the claimant's limitations should be expected to last twelve months).

Plaintiff responds that the record shows that he has suffered from depression since he ceased working in 2003. Dr. Mumford assessed Plaintiff's GAF score to be 55 on December 8, 2003 and opined that he was suffering from a "major depressive disorder, single episode, moderate." (Tr. 204). However, there are two problems with Plaintiff's response. First, evidence showing that Plaintiff suffered from depression in 2003 and 2006 does not show that he suffered from depression during any continuous twelve month period. Second, Plaintiff has admitted both to medical personnel and to ALJ Cates that he did not take his depression medication. The ALJ noted that Plaintiff told a nurse that he was not taking his medication because "he didn't think he needed it." (Tr. 364, 236). At the hearing before ALJ Cates, Plaintiff asserted that he did not get prescriptions filled, even though his wife had insurance. (Tr. 435-36). Plaintiff explained that he failed to fill the prescriptions because of financial pressures (Tr. 436), but the ALJ certainly did not commit error by discounting the credibility of Plaintiff's explanation in light of the fact that Plaintiff has stated he did not think he needed the medication at all.

Based on this evidence, the court finds that ALJ Cates properly considered Plaintiff's GAF scores in making his disability findings. The evidence, as a whole, shows that Plaintiff suffered from depression but does not show that the depression was disabling or sufficient to impair Plaintiff's ability to work. The ALJ's finding is consistent with the testimony of the VE, consistent with the lack of proof that Plaintiff suffered from depression for twelve continuous months, and also consistent with Plaintiff's minimization of his own condition.

**B.     The ALJ Did Not Err in Finding that Plaintiff Could Perform Light and Sedentary Work with Limitations**

The ALJ found that Plaintiff could perform a limited range of both light and sedentary work. (Tr. 238-39).  In making this determination, the ALJ assigned "controlling weight" to the medical source opinion of Dr. Hatchett, Plaintiff's treating orthopedist.  (Tr. 240).  Dr. Hatchett opined that Plaintiff could stand for three hours and walk for two to three hours per eight hour workday, as well as sit without limitation.  (Tr. 370).  He also found that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally.  (*Id*.)  He also found that Plaintiff suffered from moderately severe pain that could be disabling and that Plaintiff has "multiple physical problems. . . which will severely limit his ability to do work-related activities."  (Tr. 369, 371).

Plaintiff argues that the ALJ selectively used Dr. Hatchett's MSS and therefore the ALJ's RFC findings are not based on substantial evidence.  Specifically, Plaintiff contends that the ALJ did not have substantial evidence to disregard Dr. Hatchett's opinions as to Plaintiff's pain and limitations.  The court disagrees.  First of all, the relevant part of Dr. Hatchett's medical opinion is his assessment of Plaintiff's functional limitations, not the effect those limitations may have on Plaintiff's ability to work.  *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) (stating that "the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality").  In other words, the ALJ's task in using Dr. Hatchett's MSS is not to try to figure out how Dr. Hatchett would rule if he were an ALJ, but to ascertain what medical limitations afflict Plaintiff.  Dr. Hatchett's statement of Plaintiff's limitations are consistent with light

10

and sedentary work with limitations.  Dr. Hatchett's medical opinion is that Plaintiff can stand, walk, lift, and carry within the listed limitations.

Plaintiff urges this court to find Dr. Hatchett's opinion of Plaintiff's pain to be inconsistent with Dr. Hatchett's opinion of Plaintiff's ability to stand, walk, lift, and carry.  The ALJ did not find these two areas of Dr. Hatchett's testimony to be in conflict, and neither does this court.  If Dr. Hatchett thought that Plaintiff's health prevented him from performing work-related tasks within the limitations he included in the MSS, he would have given a different opinion.  It would be nonsensical for Dr. Hatchett to state on one page that Plaintiff can handle the physical requirements of limited light and sedentary work and then to state on the next page that Plaintiff's pain is totally disabling.  It is more likely that Dr. Hatchett stated that Plaintiff's pain could be disabling or that Plaintiff's conditions could prevent him from performing work-related tasks because all of Plaintiff's work history was very heavy work.  Plaintiff worked as a dye tub operator, a job that required him to regularly lift over eighty pounds at a time. (Tr. 220, 426).  A person with conditions that limit him to light work would be unable to perform very heavy work.  If Dr. Hatchett's MSS is read through the lens of Plaintiff's work history, any perceived inconsistency is resolved.  The court reads the various facets of Dr. Hatchett's opinion together and finds them to be consistent.

Furthermore, while the ALJ gave Dr. Hatchett's MSS controlling weight, the ALJ did not accept it without reservation.  (Tr. 241).  The ALJ rejected Dr. Hatchett's opinion of the degree of Plaintiff's pain by noting that:

> the medical evidence of record does not indicate the claimant has required the use of prescription pain medications and the evidence of record clearly indicates that he has been repeatedly noncompliant with treatment recommendations, the use of other medications, and has refused to use orthotics, which clearly mitigates [sic] against

a finding of disability or a determination that the claimant suffers from chronic pain at a disabling level of severity.

(Tr. 241).  The record confirms that the ALJ had substantial evidence to find as he did.  Plaintiff failed to show up for appointments or take prescribed medication.  (Tr. 435-36).  Plaintiff took only Tylenol and Advil for pain.  (Tr. 254, 372).  He used orthotics only irregularly.  (Tr. 428, 224).[2]  In rejecting Dr. Hatchett's characterization of Plaintiff pain, the ALJ relied upon medical evidence and therefore did not improperly substitute his opinion for that of trained medical professionals.

Likewise, the court finds that the ALJ relied upon substantial evidence and did not err in relying upon Dr. Hatchett's opinion instead of the opinion of Dr. Thomas.  Dr. Thomas examined Plaintiff in June and August 2003.  (Tr. 195-98).  He opined that Plaintiff could not stand for more than "20 to 25 minutes at one time and could be on his feet for more than 2 to 3 hours out of an 8-hour shift." (Tr. 197).  Further, Dr. Thomas noted that Plaintiff "certainly could not work an 8-hour shift" and "could not get back to gainful employment at the present time." (*Id*.)  Plaintiff argues alternatively that the ALJ either failed to consider Dr. Thomas's records or discredited them without substantial evidence.  Both of these arguments fail.

First, Drs. Hatchett and Thomas do not express substantially different opinions as to Plaintiff's functional abilities.  Dr. Thomas thinks that Plaintiff can stand for twenty-five minutes at a time; Dr. Hatchett thinks Plaintiff can stand for thirty.  (Tr. 197, 370).  Dr. Thomas does not state how much Plaintiff can lift, but makes reference to Plaintiff "get[ting] back to gainful employment,"

---

[2]Plaintiff contends that his testimony before the two administrative law judges in this case actually shows that he wears the braces regularly.  The court disagrees.  At the first hearing, Plaintiff said that his doctor "wants" him to wear the braces, not that he wears them regularly.  (Tr. 224).  At the second hearing when the ALJ asked him how often he wears orthotic boots, he said that he is "supposed to wear them if I'm going to be on my feet for a while."  His medical records also show that he disliked the orthotic boot originally prescribed for him.  (Tr. 372).

which suggests that he thinks that Plaintiff is incapable of resuming the very heavy work he had previously performed. (Tr. 197). This opinion is consistent with the court's reading of Dr. Hatchett's MSS. Though Dr. Thomas's record contains less information than Dr. Hatchett's, it is clear that the opinions concur as to the objective limitations on Plaintiff's physical performance. As discussed above, these objective opinions about Plaintiff's abilities are critical parts of the medical record. *See McCruter*, 791 F.2d at 1547.

Second, Dr. Thomas's opinion that Plaintiff cannot work a normal shift goes beyond a mere medical opinion. Doctors' opinions are only evidence of medical conditions and their legal opinions are not entitled to any weight unless supported in the medical evidence. 20 C.F.R. § 404.1527(e)(1) (2006) (stating that the Commissioner is responsible for determining whether a claimant is disabled and "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [a claimant is] disabled"); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) ("we note that we are concerned here with doctors' evaluations of [a plaintiff's] condition and the medical consequences thereof, not their opinions of the legal consequences of his condition"); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986) (stating that "although a claimant's physician may state he is 'disabled' or 'unable to work' the agency will nevertheless determine disability based upon the medical findings and other evidence"). There is nothing in Dr. Thomas's notes that supports his legal conclusion that Plaintiff cannot work an eight-hour shift; therefore, it was not error for the ALJ to reject Dr. Thomas's legal opinion without comment.

13

Finally, even if this court were to find that the ALJ should not have rejected Dr. Thomas's opinion outright, the court is satisfied that the ALJ did consider Dr. Thomas's opinion and gave reasons for discounting it.  ALJ Cates noted that:

> consideration has been given [to] the reports of the state agency medical consultants as well as to other treating, examining and non-examining medical sources that determined that the claimant was capable of performing sedentary work activities. . . . Limited weight has been given to this opinion as it is more restrictive [than] the findings and opinions of the claimant's treating orthopedist. . . .

(Tr. 240).  While the ALJ does not refer to Dr. Thomas by name, it is clear from this passage that the ALJ gave less weight to the more-restrictive opinion of a treating or examining physician.  None of Plaintiff's doctors fit this description as well as Dr. Thomas.  He treated and examined Plaintiff, opined that Plaintiff was limited in standing or carrying weight, and offered an opinion that Plaintiff could not work.  (Tr. 197).  These diagnoses and opinions match the description offered by the ALJ and show that the ALJ considered Dr. Thomas's opinions.  Furthermore, the ALJ expressed valid reasons to discount Dr. Thomas's opinions.  Dr. Thomas's opinion conflicted with Dr. Hatchett's, and, because both are treating physicians, the ALJ had to decide which opinion to credit over the other.  Good cause for rejecting the opinion of a treating physician exists where that physician's opinion conflicts with the medical evidence or is merely conclusory.  *See Lewis*, 125 F.3d at 1440 (stating that "'good cause' [exists] where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding" and "good cause [exists] where the doctors' opinions were conclusory or inconsistent with their own medical records") (quotations and citations omitted).  Resolving conflicts in the evidence is emphatically the role of the ALJ, and this court will not overturn the ALJ's evidentiary conclusions where they are supported by substantial evidence.

*Bloodsworth*, 703 F.2d at 1239, 1242 (stating that "credibility determinations are for the Secretary, not the courts").

### C.    The ALJ Did Not Err in Determining Plaintiff's Credibility

Plaintiff's next argument is that the ALJ did not rely on substantial evidence in finding that his subjective statements of pain are not totally credible.  Plaintiff claimed he suffers from severe pain and is generally unable to perform household tasks without the need to sit down or take a hot bath.  (Tr. 433-34).  The ALJ found that these subjective statements were inconsistent with other record evidence, *i.e.*, Dr. Hatchett's characterization of Plaintiff's impairments.  (Tr. 241).

The court finds no error in the ALJ's analysis of Plaintiff's credibility.  A claimant's subjective complaints are analyzed under the "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  It is clear that Plaintiff's underlying conditions are sufficient to cause pain, but the medical evidence shows neither that Plaintiff's pain is objectively severe enough to be disabling or that the objective conditions are sufficiently severe to cause disabling pain.  As discussed above, Dr. Hatchett's MSS is medical evidence that shows even with his pain limitations, Plaintiff is still able to perform limited light and sedentary work.  (Tr. 370).  Dr. Hatchett's opinion alone would constitute sufficient grounds for the ALJ to determine Plaintiff's testimony to lack credibility,[3] but

---

[3]*See* 20 C.F.R. § 404.1529(c) (2006) (noting that the Commissioner will look for conflicts between a claimant's subjective complaints and the objective medical evidence and discount those subjective complaints to the extent they conflict with medical evidence).

the ALJ had additional grounds.  He found that Plaintiff's claimed limitations were inconsistent with the frequency and type of treatment Plaintiff sought.  (Tr. 241).  The court has already discussed Plaintiff's apparently infrequent use of orthotics and the fact that he does not appear to require strong pain medication to maintain the functional capacity to perform light work.  The Eleventh Circuit has held that an ALJ can properly consider conservative treatment as evidence that contradicts a claimant's subjective complaints.  *See Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996).

Furthermore, it should be noted that the ALJ only discounted Plaintiff's testimony to the extent that it conflicted with Dr. Hatchett's opinion.  (Tr. 240-41).  As a result, the ALJ only rejected that portion of Plaintiff's testimony related to his claims that he suffers from "chronic lower back pain, radicular pain or numbness, or any other impairment to the extent that he can be determined totally or permanently disabled."  (Tr. 241).  In every other area, the ALJ only discounted the *degree* of impairment claimed by Plaintiff, not the underlying impairment itself.  This fact is significant because Plaintiff testified at his first hearing that he could "mow a few strips of grass" before needing to sit down and testified at his second hearing that he could wash a few dishes at a time before needing to sit down.  (Tr. 227, 433).  The time it takes to mow a few strips of grass or wash a few dishes is not obviously different from the ALJ's conclusion that Plaintiff can stand for thirty minutes at a time.  (Tr. 240).  The objective portion of the functional limitations claimed by Plaintiff do not greatly differ from the limitations assessed by Plaintiff's doctors or the RFC ultimately determined by the ALJ.  While Plaintiff may characterize his impairments differently than the ALJ, the two largely agreed as to the substance of the impairments and the functional limitations they impose.

**D.    The ALJ Sustained His Burden of Establishing that Plaintiff Can Perform Other Work in the National Economy**

Plaintiff's final argument is that the ALJ erred in determining that Plaintiff is capable of performing work that is available in substantial amounts in both the national and local economies. Because it has already been determined that the ALJ did not err in assessing Plaintiff's RFC, this argument specifically addresses the ALJ's questioning of the VE at the hearing and the use of the VE's testimony in his opinion.  Specifically, Plaintiff contends that the ALJ's hypothetical question posed to the VE did not comprehensively describe Plaintiff's impairments.

The court rejects this final argument.  The record shows that the hypothetical question posed to the VE was comprehensive and not legally deficient.  The ALJ asked the VE to identify what jobs a person with the following limitations could perform:

> let's assume we have a hypothetical individual that is currently 42 years of age, has a tenth grade education and his past work as described.  And according to the . . . medical source opinion provided by Dr. Hatchett, the individual can stand for one half hour, up to three out of eight hours, walk for one half hour, up to two to three hours.  Sitting is unlimited.  Can frequently lift ten pounds, can occasionally lift 20 pounds.  Can push and pull occasionally, with right [arm] frequently, with the left arm, frequently, with the right leg, occasionally.
> . . .
> With the left leg, occasionally.  Climbing, never; balancing, occasionally; stooping occasionally; kneeling occasionally, crouching occasionally, crawling occasionally, reaching overhead occasionally; handling, fingering, feeling, talking and hearing, frequently; working in extreme cold occasionally, extreme heat occasionally; wetness and humidity occasionally, vibration occasionally; exposure to fumes, noxious odors, dust, mist, gasses or poor ventilation, frequently; proximity to moving mechanical parts, frequently; working in high exposed places, never; driving automobile equipment, occasionally.

17

(Tr.438-39).  The VE identified jobs at the light, unskilled level that such a person could perform, such as parking lot attendant, photo finisher, and ticket seller.[4]  (Tr. 440).  The ALJ then further requested that the VE identify sedentary jobs with the same postural limitations, and the VE mentioned box inspector, warehouse checker, and ticket maker.  (Tr. 440).  Again, the ALJ asked the VE if someone with Plaintiff's mental impairments, including his inability to do significant reading, would be precluded from doing any of the listed jobs.  (Tr. 440-41).  The VE opined that the mental impairments would not preclude performance of the listed jobs.  (Tr. 440-41).

Plaintiff's contention that this exhaustive hypothetical question does not adequately identify Plaintiff's limitations is without merit.  Plaintiff suggests that the standing and walking limitations in the question are ambiguous, but the court neither sees an ambiguity in the question nor any evidence that the VE was confused.  Furthermore, Plaintiff's argument that the question is deficient because it does not include Plaintiff's GAF scores is likewise unpersuasive.  As discussed above, the ALJ had substantial evidence to conclude that Plaintiff's actual level of function was higher than his isolated GAF scores across three months indicated.  Finally, the court rejects Plaintiff's assertion that the ALJ improperly excluded from his hypothetical question subjective limitations from which Plaintiff claimed to suffer.  These limitations, including Plaintiff's need to miss more than two days of work per month for health reasons or elevate his legs above his waist several times a day, are without support in the medical record.  (Tr. 443).  The ALJ noted that he did not find Plaintiff's subjective complaints to be credible where they were unsupported by the medical evidence of record,

---

[4]Plaintiff does not argue that, even if the ALJ's hypothetical question was proper, the jobs proposed by the VE do not exist in substantial enough numbers to carry the Commissioner's burden of showing that Plaintiff can work.  For the sake of thoroughness, however, the court notes that the jobs, of which 430,000 exist nationally and 21,000 exist locally, are numerous enough to carry the Commissioner's burden.

so it was not error for the ALJ to exclude from his hypothetical question these impairments.  The court concludes that the ALJ posed a proper hypothetical question to the VE.

## VI.    Conclusion

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  The Commissioner's final decision is due to be affirmed, and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this ____25th____ day of March, 2008.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE